**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20120-CR-GAYLES**

UNITED STATES OF AMERICA,

Plaintiff,

DANIEL JAY MOTHA,

Defendant.
______________________________________/

# DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD VARIANCE

Defendant Daniel Motha, by and through undersigned counsel, respectfully submits this memorandum in advance of sentencing. For the reasons set forth below, Mr. Motha respectfully asks the Court to vary downward from the advisory United States Sentencing Guidelines ("USSG") range and impose a sentence of three years' probation and restitution as provided in the Plea Agreement. We submit that this sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a). Mr. Motha does not minimize his conduct. However, multiple factors described in detail below demonstrate that he is an ideal candidate for probation.

*First,* Mr. Motha, on his own volition, became a key cooperating witness against Rishi Kapoor. Mr. Motha recognized that he contributed to systemic criminal conduct at Location Ventures, and he decided to assist prosecutors and help bring Mr. Kapoor to justice. With an expected 5K1.1 motion and a guidelines level on a tax offense of 30 to 37 months at an offense level 19, a sentence of probation is well within the heartland type of sentences given by judges nationwide for this type of crime.

*Second*, Mr. Motha did not run Location Ventures, nor was he the leader / organizer of the underlying conduct that led to Mr. Motha's conviction. Last month, the Honorable K. Michael Moore sentenced Rishi Kapoor, who was the actual leader/organizer, to sixteen months for his participation in this conspiracy.[1] Clearly, a key cooperator such as Mr. Motha is entitled to a sentence of far less than that received by Mr. Kapoor.

*Third*, the tax loss driving the offense level was paid in full before this case was charged, and restitution on what remains will be paid faster if Mr. Motha is permitted to seek and maintain employment.

*Fourth*, this Court does not have to guess whether supervision is appropriate for this defendant because he successfully completed his term of supervision in the Massachusetts "misbranding" matter without a violation (the "Massachusetts Matter"). To be clear with respect to the Massachusetts conviction, it did *not* concern conduct that occurred after Mr. Motha's conviction here, or even after Mr. Motha knew he was under investigation. Likewise, this tax offense did *not* concern conduct that occurred after Mr. Motha's conviction in Massachusetts. This is not a case of a defendant who committed a crime, served a sentence, and then reoffended. The Southern District of Florida charged Mr. Motha seventeen months after Massachusetts did for conduct occurring within the same time period. The offenses concern completely different types of conduct, and Florida could have just as easily prosecuted both offenses together. But for Massachusetts taking a leading role in the misbranding offense and deciding to go ahead and prosecute separately, Mr. Motha would not have one criminal history point.

---

[1] Mr. Kappor's sentence for the tax fraud conspiracy is to be served consecutively to his money laundering conviction.

In short, a sentence of imprisonment is not needed. As Mr. Motha's allocution statement makes clear, he has taken full and complete responsibility for his own conduct as chief financial officer at the LV Entities. *See* Exhibit 2. However, it is important to remember that there is more to Mr. Motha than just the crime he committed years ago. He is 42 years old. He grew up outside Boston, came to Miami for college at eighteen, and remained here. He now calls South Florida home. PSR ¶¶ 67, 72, 88. He married Nicole Cuellar in 2024, and they have a son, Levi, who is not yet two. PSR ¶ 71. Mr. Motha volunteers with the Little Lighthouse Foundation at the Chapman Partnership in Miami, where he sits in on Story Hour and listens to children read out loud and plays kickball with them afterward. PSR ¶ 70. The underlying payroll taxes have already been paid to the government, and the individual victims have been made whole. In addition, he is already paying what he owes, a mix of penalties and interest, and he has secured full-time employment so that his family can move beyond this horrific episode in his life. Twenty people have written to the Court on his behalf. *See* Exhibit 1. Allowing Mr. Motha to work, volunteer and raise his son would do far more than sending him to prison.

## I. PROCEDURAL POSTURE AND THE GUIDELINE CALCULATION

On March 31, 2026, nearly a year after he began cooperating with the government, the government filed an Information charging Mr. Motha with a single count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. He surrendered on April 14, 2026, waived indictment, was arraigned, and was released the same day on a stipulated $250,000 personal surety bond. PSR ¶¶ 15, 40; ECF No. 5. On June 25, 2026, he pleaded guilty to the single count of conspiracy. PSR ¶ 1. The United States Probation Department has supervised him since his release and reports that he has complied with every condition. PSR ¶ 17.

Mr. Motha does not object to the guideline calculation. His objections to the Presentence Report, filed September 3, 2026 [ECF No. 26], are factual, and none of them changes the offense level, the criminal history category, or the advisory range.

With respect to the PSR, two competing computations are before the Court. The Probation Office applied § 2T1.9 by way of § 2X1.1, which directs the Court to § 2T1.1 and the tax table at § 2T4.1. A tax loss of $1,376,598.32 yields a base offense level of twenty under § 2T4.1(H). PSR ¶ 49. With the three-level reduction for acceptance of responsibility, the total offense level is seventeen, the criminal history category is I, and the advisory range is 24 to 30 months. PSR ¶¶ 55, 56, 58, 61, 116. The parties' stipulated calculation in the Plea Agreement runs through the § 2T1.6(b)(1) cross-reference to § 2B1.1 and produces a total offense level of nineteen and a range of 30 to 37 months. PSR ¶ 117. The Government has objected to the Report and asks the Court to adopt that calculation [ECF No. 25].

Consistent with paragraph 13 of the Plea Agreement, Mr. Motha takes no position adverse to the parties' stipulated calculation and does not oppose the Government's objection. This memorandum therefore argues against the higher of the two ranges, 30 to 37 months. The variance requested is the same under either one.[2]

Mr. Motha recognizes that probation is not available as a guideline sentence in Zone D. USSG § 5B1.1(a) & cmt. n.2; PSR ¶ 121. However, it is available as a statutory sentence, for a term of one to five years. 18 U.S.C. § 3561(c)(1); PSR ¶ 120. Under this framework, Mr. Motha asks for a variance.

---

[2] The third acceptance level depends on a Government motion under § 3E1.1(b). PSR ¶ 56. If that motion is not filed, the total offense level is twenty and the advisory range is 33 to 41 months under the stipulated calculation, or eighteen and 27 to 33 months under the Report's. Undersigned understands the Government intends to file it and notes the point only to preserve it.

## II. THE OFFENSE CONDUCT AND MR. MOTHA'S ACCEPTANCE OF RESPONSIBILITY

Mr. Motha pled guilty to an Information, cooperated with the government, and accepts responsibility without qualification. His title was chief financial officer of the LV Entities, but it was Mr. Kapoor who had complete and total control over the companies. For twenty-two quarters, from the quarter ending September 30, 2017 through the quarter ending December 31, 2022, those companies withheld trust fund taxes from their employees' wages, incurred the employer's share of FICA, and remitted neither. PSR ¶ 26. He knew. His controller told him and his chief operating officer told him. PSR ¶ 30. In June 2020 Mr. Motha made a false entry in the company's books showing a $225,203.65 payment toward the payroll tax liabilities that had never been made. PSR ¶ 33. The Information alleges that entry was made with Mr. Kapoor's knowledge and direction. Information, but to be clear, it was Mr. Motha who made the entry. ¶ 12(d) [ECF No. 1]. He and Mr. Kapoor told investors those liabilities had been satisfied when they had not. PSR ¶ 34. And in August and October of 2022, while the employees' withholdings still sat with the company, he took $183,838.82 in distributions out of the sale of the 800 Dixie project (of which $76,357 was a separate legitimate return of capital for an LP investment). PSR ¶ 28.

Mr. Motha offers no justification for his conduct and he is not attempting to foist the entirety of the blame on to Mr. Kapoor. He waived indictment and pleaded guilty to the single count charged. PSR ¶ 1. He raises no objection to the guideline calculation, and the objections he filed to the Presentence Report are factual and change neither the offense level nor the advisory range [ECF No. 26]. He began cooperating against Mr. Kapoor in the spring of 2025, before the Government had charged him with anything. And as the Government's motion for "pre-payment" makes clear (Dkt. 27), Mr. Motha is doing everything he can to pay restitution to victims, including making a $50,000 payment before he has been court-ordered to do so.

## III. MR. MOTHA'S BACKGROUND AND CHARACTER

Noted above, twenty people have written to the Court on Mr. Motha's behalf. Their letters span thirty-five years: his wife, his parents, his brother and sister-A, his mother-in-law, the chief executive who employed him for eight years, a colleague of more than fifteen years, the program director for the non-profit where he volunteers, nine friends, and his treating therapist. These letters are offered to demonstrate the history and characteristics of Mr. Motha. The Court sentences more than the conduct before it. It sentences the totality of the circumstances, and the whole person, in context. The context presented here highlights a man who has accepted responsibility, has learned from his mistakes, and is by all accounts an ideal candidate for probation.

Mr. Motha's age, his family ties and responsibilities, and his community ties were, until last year, addressed by the Chapter Five, Part H policy statements. Amendment 836 deleted those provisions so that such offender characteristics could inform the sentence directly, as a variance under § 3553(a). *See* USSG ch. 1, pt. A, introductory cmt. (2025). The Court may give them full weight.

**Upbringing and work.**

Daniel Motha was born in Newton, Massachusetts on October 8, 1983, the older of two boys. PSR ¶¶ 67, 68. His parents have been married forty-five years and raised their sons in a three-bedroom split level outside Boston. PSR ¶ 67; Ex. 1 at 7 (Susan Motha). His father Ronald owns and still runs an electrical contracting business; his mother Susan spent thirty years in hospital human resources. PSR ¶ 67; Ex. 1 at 7. He was raised in Wayland and then in Framingham. PSR ¶ 67.

Ronald Motha writes that his son worked alongside him on job sites from a young age and became "one of my best employees," reliable enough that Ronald would leave him in charge of

jobs, handling homeowners, workers, and mechanical problems on his own. Ex. 1 at 5. He closes with this: "in all of the years that I have known my son, I have never seen him do anything I would consider dishonest or wrong." *Id*. Susan Motha writes that DJ was expected to contribute to the household from a young age, that at thirteen he applied for and was accepted into a construction program at the Beckett YMCA camp where he helped build porches and decks, and that at eighteen he took a job washing dishes in the kitchen at UMass Memorial Medical Center. Ex. 1 at 7.

He left for the University of Miami at eighteen, graduated with a business degree in 2005, and has lived in the Miami area for twenty-five years. PSR ¶¶ 72, 88.

Several writers describe the same characteristics. Nicole Cuellar writes that when they began dating she wondered whether he was struggling, because he drove a used car and still had roommates long after his friends had moved in with partners. Ex. 1 at 3. Susan Motha writes that he kept roommates and a ten-year-old car until four or five years ago and that when he married, he and Nicole chose a small, simple wedding. Ex. 1 at 7 to 8. Mr. Motha's monthly income today is $526 against monthly expenses of $8,502, and his net worth is negative. PSR ¶ 96.

**Twenty-one years of trust.**

Jose Boschetti is the founder and chief executive of The Boschetti Group, a South Florida real estate development company. He hired Mr. Motha in 2005 as an assistant controller and has known him for twenty-one years. Ex. 1 at 16. Mr. Motha grew into the controller role, overseeing the full financial operations of the company and managing tens of millions of dollars across active development projects. *Id*. Mr. Boschetti gave Mr. Motha access to and responsibility for his own personal finances. *Id*. Mr. Boschetti "trusted him completely, not just his competence, but his integrity and his discretion. That is not a decision I made lightly and it is not one I have ever regretted. In all the years DJ handled those matters, he was honest and completely trustworthy."

*Id*. Mr. Motha left in 2011 and Mr. Boschetti welcomed him back in 2013 "without hesitation." *Id*.

Mr. Boschetti understands and acknowledges Mr. Motha's role in this matter. "I know why DJ is before your Court. I know the details of what happened and I will not pretend it did not." *Id*. His point is that it "does not match the person I have known for twenty-one years," a person who "has never been someone who hides from hard things" and who, "[w]hen he is wrong, he says so." Id. Jennifer Duran, a colleague of more than fifteen years, writes that Mr. Motha taught her the basics of accounting when she was starting out and never hesitated to answer her questions no matter how busy he was, and she credits him with the confidence and knowledge that built her career. Ex. 1 at 18. In September 2026 Mr. Motha returned to full-time work for The Boschetti Group, where he worked for Jose Boschetti before joining Location Ventures.

**Husband and father.**

Mr. Motha married Nicole Cuellar on May 15, 2024, after eight years together. PSR ¶ 71. Their son Levi was eighteen months old when the Probation Officer interviewed his father and will be about twenty months old on the day of sentencing. *Id*. Nicole suffers from anxiety, and she has also been the one supporting the household.[3] *Id*.; PSR ¶ 93. Mr. Motha was unemployed and financially supported by his wife from 2023 through 2024. PSR ¶ 93. He also previously worked about twenty-five hours a week in acquisitions for her real estate lending company. PSR ¶ 92. The family has been renting a house in Miami for $4,300 a month. PSR ¶ 72. That lease ends on September 15, 2026. Rather than renew it, Mr. Motha, Nicole, and Levi are temporarily moving in with Nicole's mother and stepfather to cut expenses while Mr. Motha pays down what he owes.

---

[3] Ms. Cuellar's company has not recently been bringing in income; as a result, Mr. Motha will need to transition to financially supporting the family.

Nicole Cuellar writes that her postpartum period "has not been easy, and through it all, DJ has been the rock of our family, steady and present, even while everything around him was filled with uncertainty and pressure." Ex. 1 at 4. Merci Serrano, Mr. Motha's mother-in-law, writes that her daughter recovered from major surgery during a difficult postpartum period and that Mr. Motha "stepped in physically, mentally and emotionally so my daughter could fully focus on caring for their son and recovering herself." Ex. 1 at 14. She adds that when he noticed she and her husband had been overcharged on their property taxes, he helped them recover the money, which matters to retirees living on Social Security. *Id*. Shavon Whitehead describes the ordinary weekday version of the same thing: the morning routine, reading to Levi, walks with the family's rescue dog. Ex. 1 at 38.

His parents are not well. Ronald, seventy-four, had a triple bypass and received a pacemaker in 2024, and in May 2026 had surgery to put a metal plate in his wrist. PSR ¶ 67. Susan, seventy-five, had a stroke this past July. *Id*. They live in Massachusetts and they know why their son is in this courtroom. *Id*. So does his brother Jeffrey, who was his codefendant in the Massachusetts case and who works for their father. PSR ¶ 68. Jeffrey writes that he speaks with his brother almost every day and still turns to him first for advice. Ex. 1 at 9 to 10.

**Story Hour at the Chapman Partnership.**

Mr. Motha volunteers with the Little Lighthouse Foundation in collaboration with the Chapman Partnership in Miami. PSR ¶ 70. Nazeem Hasan, the Foundation's Program Director, writes that Mr. Motha's reliability was evident enough that Mr. Hasan referred him to the Foundation's Board to serve as a Chapter Leader. Ex. 1 at 20. In that role he organizes and plans the Story Hour projects, manages the other volunteers, and reads with a child each week at a facility that houses homeless children. Id. One child "grew so attached to Daniel that he would ask for him

specifically week after week, showing visible sadness on the rare occasions Daniel could not attend." Ex. 1 at 21. The children asked for him by name for two field trips this past summer, and he was the only volunteer from the Foundation invited. Id.

**What DJ's friends describe.**

Nine friends supplied letters of support. Several of whom have known Mr. Motha for twenty years or more. Jeff Jenkins, who officiated his wedding, writes that in 2012, after Jenkins lost his mother and his job in the same year, Mr. Motha gave him a mattress on the floor of his room in a shared apartment for several months, smoothed it over with the roommates, and absorbed the added cost; that December, rather than fly home to Boston as he did every year, Mr. Motha stayed in Miami so Jenkins would not spend the holidays alone. Ex. 1 at 24. Daniel Norber, a college roommate and groomsman, writes that of all his closest friends, Mr. Motha is the only one who consistently asks after Norber's wife, who has had long COVID for two and a half years. Ex. 1 at 30. Nicole Cuellar writes that a few months into dating, when she was a recent graduate carrying credit card debt, Mr. Motha offered to loan her the money to pay it off so she would not spend years bleeding interest. Ex. 1 at 3.

Two of these writers speak to how Mr. Motha has handled this case in private. Jenkins writes that when the two of them discuss it, Mr. Motha "has never once been defensive or evasive, and he has never tried to shift responsibility onto anyone else." Ex. 1 at 25. Norber writes that Mr. Motha told him about the case when he "could have waited, or not said anything about" it. Ex. 1 at 31.

**Treatment.**

Eri Çela, a licensed marriage and family therapist, has treated Mr. Motha across two periods: nine sessions from October 24 through December 26, 2024, and twenty-seven sessions

since February 5, 2026, for a total of thirty-six sessions. Ex. 1 at 42. Mr. Motha first sought treatment in October 2024, before this case was charged, in preparation for becoming a father. *Id*. Mr. Çela reports increased insight, improved ability to respond to stressors, and, notably, "willingness to reflect upon his role within his family and relationships rather than focusing exclusively on the behavior of others." Ex. 1 at 43. He recommends that treatment continue. *Id*. The Presentence Report, prepared before this letter was available, records only that Mr. Motha was "open to receiving therapy." PSR ¶ 80.

Mr. Motha was also in a car accident in August 2025 that left him with a herniated and bulging disc in his neck and lower back pain, and he goes to physical therapy twice a week. PSR ¶ 77. These needs implicate § 3553(a)(2)(D), which directs the Court to consider the need to provide the defendant with medical care "in the most effective manner." The physical therapy and the ongoing psychotherapy are both established, both working, and both community-based.

These letters are not offered to excuse what Mr. Motha did. They establish that the conduct in this case is inconsistent with the man twenty people describe across thirty-five years, including the employer who trusted him with his own money for two decades.

## IV. MR. MOTHA'S COOPERATION

Long before he was charged with anything arising out of Location Ventures, Mr. Motha decided that he would take full responsibility for what he had done. He also agreed to cooperate against co-conspirator Rishi Kapoor, his former friend, who led and organized this fraud.

In the spring of 2025, Mr. Motha sat for a multi-hour proffer with prosecutors and investigators. He had worked directly alongside Mr. Kapoor for years, and he gave the Government what it needed to build their prosecution. That information led directly to Mr. Kapoor's indictment.

The Information in this case was not filed until March 31, 2026, nearly a year after Mr. Motha began cooperating.

His cooperation did not stop at the proffer. After Mr. Kapoor was indicted, Mr. Motha agreed to testify against him if the case went to trial. He instructed his counsel to continue providing information to the Government as it built the case. He met with and took calls from prosecutors and an FBI agent on multiple occasions, beginning in 2025 and continuing through July of 2026. Mr. Kapoor was aware that Mr. Motha was cooperating with the federal investigation into Location Ventures, and that awareness was a significant factor in his decision to plead guilty rather than go to trial.

Mr. Motha also resolved the parallel civil case, settling with the Securities and Exchange Commission.

He further cooperated with the receiver. After Location Ventures collapsed in 2023, Mr. Motha was no longer employed and no longer being paid. Nonetheless, he worked with the company's new Manager (at that time, a retired state judge) anyway. Two of the letters at Exhibit 1 describe it independently. His mother writes that he "continued for months to assist the new manager, a retired local judge, with the liquidation of the company's assets," and that he did so "doing everything he could to help make sure that the vendors got paid and to help bring the process to a responsible conclusion." Ex. 1 at 8. His wife writes that when everything came down, he "made himself available to Judge Fine when the Judge was placed as the new manager even though DJ was no longer employed by the company. He didn't disappear but answered calls and tried to make it right." Ex. 1 at 4.

That work is not finished. Last month Mr. Motha met with the Receivership again to review items and answer questions, and the Receivership asked him to keep an open line to assist with

whatever else it needs. He has told his counsel, and he tells this Court, that assets taken from the company should be returned for the benefit of the people who lost money.

The Government has informed the defense that, subject to the US Attorney's ultimate approval, it will move under USSG § 5K1.1 for a downward departure based on Mr. Motha's substantial assistance. The defense respectfully submits that when the § 5K1.1 and § 3553(a) are considered together, a sentence of probation is the appropriate result.

## V. LEGAL STANDARD

The Guidelines are "effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), and are "the starting point and the initial benchmark" but "not the only consideration," *Gall v. United States*, 552 U.S. 38, 49 (2007). The Court must make "an individualized assessment based on the facts presented," *id.* at 50, and must impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set out in § 3553(a)(2). 18 U.S.C. § 3553(a). The weight assigned to any specific § 3553(a) factor is committed to the sound discretion of the sentencing court. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015); *see United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009) ("The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court, and we will not substitute our judgment in weighing the relevant factors.").

*Gall* established that a sentence outside the guidelines range does not require "extraordinary" circumstances, and a reviewing court may not apply "a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required." 552 U.S. at 47. The requirement is that the justification be "sufficiently compelling to support the degree of the variance." *Id.* at 50. *Gall* itself reinstated a sentence of probation for a defendant whose advisory range was 30 to 37 months, the same range the

Government asks this Court to adopt, and described probation as what it is, "a substantial restriction of freedom." *Id.* at 43, 48.

Congress has directed that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. The Supreme Court has given that command its full effect, holding that a sentencing court must be permitted "the fullest information possible concerning the defendant's life and characteristics," and that a Guidelines policy statement purporting to forbid consideration of a relevant fact does not bind the court's § 3553(a) analysis. *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see id.* at 480, 487 to 491. "[P]unishment should fit the offender and not merely the crime." *Id.* at 488 (quoting *Williams*, 337 U.S. at 247).

Effective November 1, 2025, Amendment 836 deleted Chapter Five, Part H of the Guidelines Manual in its entirety and deleted §§ 5K2.0 through 5K2.24 and § 5K3.1 of Part K. *See* USSG App. C, amend. 836; USSG Manual ch. 5, pts. H, K (2025). The Commission was explicit about the effect of those deletions:

> The Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. 3553(a). The removal of departures from the Guidelines Manual does not limit the information courts may consider in imposing a sentence nor does it reflect a view from the Commission that such facts should no longer inform a court for purposes of determining the appropriate sentence.

USSG ch. 1, pt. A, introductory cmt. (2025); *see also* USSG App. C, amend. 836 (Reason for Amendment). The text of the deleted provisions is reproduced at USSG App. B, pt. III (2025).

Everything raised below is offered as a variance under § 3553(a), and the pre-*Booker* case law limiting the grounds for departure from a then-mandatory range does not govern it.

## VI. A SENTENCE OF PROBATION IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY

Perspective is critical in a case such as this. Mr. Motha offers no excuse for his conduct in this case. However, this was not a scheme conceived at the outset to defraud anyone. This is an unpaid quarterly deposit of tax monies that morphed into a felony over the course of five years. Critically, all of the withheld tax has now been paid to the government. What remains to be paid—and which Mr. Motha *will* pay—are penalties and interest.

### A. Mr. Motha Was Not the Man Running Location Ventures. A Sentence of Probation Avoids an Unwarranted Disparity.

Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The most useful comparator is Mr. Kapoor. According to the U.S. Probation office ("USPO") "Motha was not a manager, organizer or leader in the instant criminal activity; therefore, neither an aggravating nor a mitigating role adjustment is recommended for Motha." PSR ¶ 41. Whereas "Kapoor was deemed an organizer, leader, manager, or supervisor . . . therefore, two-level was recommended for him pursuant to, § 3B1.1(c)." PSR ¶ 42.

The record explains why. Kapoor was the chief executive of Location Ventures from 2016 through July 2023 and the manager of the Location Ventures projects. PSR ¶ 42. He held that position for the entire charged period. Mr. Motha was replaced as chief financial officer in August 2022. PSR ¶¶ 20, 41. When Mr. Motha wrote in January 2019 that "[a]t some point we need to start paying these," referring to the taxes, it was Kapoor who answered, "Maybe after VV and URBIN are all rolling fee wise?" PSR ¶¶ 31, 32. When employees of the company raised the trust

fund taxes directly, it was Kapoor who "responded that they would resolve the trust fund tax matter when the IRS required them to do so." PSR ¶ 35. When the false entry was made in the company's books by Mr. Motha, even this, as the Information alleges, was made "with Rishi Kapoor's knowledge and direction." Information ¶ 12(d) [ECF No. 1]. Mr. Motha is not shifting the blame. He has admitted his conduct without qualification. He offers it because § 3553(a)(6) asks the Court to sentence him fairly and proportionally.

Importantly, this is not the first time Kapoor withheld trust fund taxes. He did the same thing at a prior company he controlled, failed to remit them, and had been "apprised of his failure to do so by the IRS." Factual Proffer ¶ 25(a), *Kapoor* [ECF No. 47].

On August 28, 2026, Judge Moore sentenced Kapoor to 136 months' imprisonment. Judgment, *Kapoor*, No. 26-20073-CR-MOORE (S.D. Fla. Aug. 28, 2026) [ECF No. 65]. That term is composed of 120 months on Count 10, which charged money laundering in violation of 18 U.S.C. § 1957, which is the statutory maximum, and sixteen months on Count 13 to run consecutively. *Id.* Count 13 is the conspiracy to defraud the United States in this case. *Id.*

Kapoor's stipulated adjusted offense level on Count 13 was twenty-one, which produced a range of 37 to 46 months. Plea Agreement ¶ 11, *Kapoor*. Mr. Motha's stipulated adjusted offense level on the same count is nineteen, and the two-level difference is the § 3B1.1(c) enhancement that Kapoor received and Mr. Motha did not. PSR ¶ 117. Given Mr. Kapoor's sentence, a sentence for Mr. Motha of far less than the 16 months Mr. Kapoor received for Count 13 would be just and appropriate.[4]

---

[4] The allocation between Kapoor's two counts follows USSG § 5G1.2(d), and the parties stipulated to it: "120 months being served on Count 10 and the remainder of the guideline range to be served consecutively on Count 13 pursuant to Section 5G1.2(d)." Plea Agreement ¶ 13, *Kapoor* [ECF No. 48]. Mr. Motha does not contend that sixteen months reflects an independent judicial valuation of

Mr. Kapoor is not offered as a freestanding § 3553(a)(6) comparator. His treatment bears on the relative culpability this Court weighs under § 3553(a)(1) and (a)(2)(A), and on *Gall*'s instruction that a sentencing court consider "the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated." *Gall*, 552 U.S. at 55. What this record shows is that under this plea agreement the organizer of the conspiracy is slated to serve a shorter term on the same count and for more egregious conduct.

Mr. Motha was never charged with a fraud on investors, never charged with money laundering, never charged with a substantive tax offense, assisted in the payment of the taxes to the Treasury such that no employee suffered long-term harm, and has no prior instance of participating in this conduct. He surrendered voluntarily and has been on personal surety, in full compliance, since April.

**B. The Tax Loss That Drives the Offense Level Was Paid in Full Before This Case Was Charged.**

For twenty-two quarters, from the quarter ending September 30, 2017, through the quarter ending December 31, 2022, the LV Entities withheld trust fund taxes from their employees' wages, incurred the employer's FICA obligation, and paid neither. PSR ¶ 26. The money went to the company's discretionary expenses instead. Contractors and employees got bonuses, including Mr. Motha and Rishi Kapoor. Sales agents at a luxury brokerage got commissions. And there were distributions out of the sale of the 800 Dixie project, one of which he is agreeing to repay because other investors ended up not receiving their pro-rata portion of that distribution, amounting to

---

Count 13 in isolation. Sixteen months is the term actually imposed on the count to which he has pleaded guilty, for the defendant the Probation Office identified as that conspiracy's organizer. And Kapoor's own standalone range on that count, at the offense level the parties stipulated, was 37 to 46 months.

$107,481.82, went to Mr. Motha in August and October of 2022. PSR ¶ 28. While this conduct is, as USPO describes it, embezzlement from the people whose wages were withheld, it did not begin as a deliberate scheme to defraud victims. PSR ¶¶ 28, 43.

In this case Mr. Motha's warnings were overruled and the debt grew. In the quarter ending September 30, 2017, the shortfall was $8,654.16. PSR ¶ 26. Through the end of 2018 the entire accumulated liability was $78,096.61, less than six percent of the final figure. The two quarters ending March 31 and June 30 of 2022 account for $376,459.59. *Id.* Mr. Motha was replaced as chief financial officer in or around August 2022, and the two quarters that follow come to $70,645.00 and $518.34. *Id.*; PSR ¶¶ 20, 41.

This is not offered as an excuse. But it demonstrates that this is not the case of a man who set out with the intent to steal, con, or manipulate victims or the U.S. Treasury. Mr. Motha noticed a problem, watched it mount, let a problem grow, did nothing to stop it, and benefitted from its course. And, as noted above, the debt was paid. In July 2023 the LV Entities retained a former judge with receivership experience to manage the company. PSR ¶ 37. Within two months he filed every delinquent Form 941 and remitted the entire $1,376,598.32. *Id.* The IRS has held that money since September 2023. What is still outstanding is more than $800,000 in penalty and interest and $449,979.70 owed to the Location Ventures Receivership (the "Receivership"), and Mr. Motha has agreed to pay both. PSR ¶¶ 38, 45.

On April 16, 2026, two days after he surrendered, Mr. Motha moved money out of the family's savings account and paid the Internal Revenue Service $15,758. PSR ¶ 106. The Report records that payment inside a recital of his April bank statements. It was made before the Presentence Report, and before any payment schedule was set. *Id.*

**C. Specific Deterrence and the Protection of the Public Are Already Satisfied.**

The Court does not have to predict whether federal supervision will work on Mr. Motha. It already has. He served a year of federal probation and was discharged without a violation four months before this Report issued. PSR ¶ 60. He has been on pretrial supervision in this case since April 2026, and his officer reports full compliance. PSR ¶ 17.

The offense involved no violence and no threat of violence, and Mr. Motha has no other criminal conduct, no pending charges, and no other arrests. PSR ¶¶ 62 to 64. He was replaced as chief financial officer of Location Ventures in August 2022, left the company by 2023, and the LV Entities' affairs are now in the hands of the Location Ventures Receivership. PSR ¶¶ 20, 43, 45, 94. He holds a seventy percent interest in JDM Supply, LLC, the entity from his Massachusetts case, which he reports is worth nothing and which ceased operating in 2021. PSR ¶ 108. The conditions proposed below deal with that interest directly.

**D. General Deterrence Does Not Require a Term of Imprisonment Here.**

When considering general deterrence, the Commission has explained that "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." USSG ch. 2, pt. T, introductory cmt. But the Commission's own sentencing data shows that a non-custodial sentence in a tax case of this size is not an outlier and serves this stated purpose.

**1. The Commission's own data shows that a non-custodial sentence in a tax case such as this is not an outlier.**

Whether as a final offense level of 19 or 17, data from the U.S. Sentencing Commission confirms that a sentence of probation is well-within the heartland of appropriate sentences.

Per U.S. Sentencing Commission Individual Offender Datafiles for the years 2014-2025, of the 439 defendants sentenced nationally for tax with final offense level 19 and a CHC of I, the

median sentence was 15 months; 17.1% received no term of imprisonment; 48.5% received a judge-initiated below-range sentence; and 18.5% received a §5K1.1 substantial-assistance departure. 81 of the 439 defendants received a §5K1.1 Substantial Assistance departure, and for those particular defendants, the median sentence was 8 months and 39.5% received no term of imprisonment. For those same years, there were 1,286 defendants sentenced nationally for tax with final offense level 17–19 and a CHC of I. For those defendants, the median sentence was 12 months; 18.4% received no term of imprisonment; 51.1% received a judge-initiated below-range sentence; and 13.5% received a §5K1.1 substantial-assistance departure. 173 of the 1,286 defendants also received a §5K1.1 substantial-assistance departure, and for those defendants, the median sentence was 6 months and 42.2% received no term of imprisonment. Far from being an outlier, a sentence of probation on these facts is not atypical.

Even when examining only the most recent data, it is clear that a probationary sentence is appropriate. In fiscal year 2025, tax offenders were sentenced within the guideline range less often than any other category of federal offender. Only 24.7 percent of them received a within-range sentence, against 51.5 percent of federal offenders overall, and 57.9 percent received a variance. U.S. Sent'g Comm'n, 2025 Sourcebook of Federal Sentencing Statistics tbl. 31. Not one tax offender in the country received an above-range departure. *Id.*

The numbers are more striking under the very guideline the Government asks this Court to apply. Of the sixty-three offenders sentenced under § 2T1.6 in fiscal year 2025, twelve were sentenced within the range and forty-four received a variance. In percentage terms, 19.0 percent within the range and 69.8 percent varied. *Id.* tbl. 32.

Non-custodial sentences are ordinary in these cases. In fiscal year 2025, 29.3 percent of federal tax offenders received an alternative sentence rather than imprisonment, compared to 7.2

percent of federal offenders generally. *Id.* tbl. 13. Of the 355 tax offenders in Criminal History Category I, 240 received a term of imprisonment, which means 115 of them, 32.4 percent, did not. *Id.* tbls. 27, 28. Among those who were imprisoned, the median term was fifteen months, half of the bottom of the range the Government asks the Court to impose from. *Id.* tbl. 28. And the Commission's Quick Facts publication reports, for the tax guidelines it covers, an average guideline minimum of twenty-six months against an average sentence imposed of seventeen months, with downward variances in 56 percent of cases at an average reduction of 61 percent. U.S. Sent'g Comm'n, Quick Facts: Tax Fraud Offenses (FY2025).[5]

A sentence of probation here would place Mr. Motha in a large and unremarkable group of federal tax defendants.

**2. What deters is the certainty of prosecution, not the length of the sentence.**

According to the Department of Justice, "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment," and "[i]ncreasing the severity of punishment does little to deter crime." Nat'l Inst. of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* 1 (May 2016), NCJ 247350. The Department's research arm has since concluded that the variable that matters is detection, not duration. *Del Campo* says the same thing in the language of § 3553(a)(2)(B). *United States v. Del Campo*, 695 F. App'x 453, 459 (11th Cir. 2017).

Mr. Motha was a chief financial officer who did not remit payroll taxes to the Treasury and used the money inappropriately. He now has a felony conviction under 18 U.S.C. § 371, a restitution judgment of more than $1.2 million that will follow him for years, a civil tax assessment on top of it, a waiver of the statute of limitations on his personal and corporate liabilities for seven

---

[5] The Quick Facts publication covers offenders sentenced under §§ 2T1.1 and 2T1.4 and does not include those sentenced under § 2T1.6 or § 2T1.9. The Sourcebook figures cited above are for the Commission's broader "Tax" offense category, which includes all four.

tax years, and the consequences that come with a second federal felony. Plea Agreement ¶¶ 16, 17 [ECF No. 22]. A prison sentence will have no greater deterrent effect. It will only keep him from working to pay what he owes.

**E. Mr. Motha Has Already Served a Federal Sentence for Conduct Inside the Years Charged Here.**

Mr. Motha has one criminal history point arising from a misdemeanor "misbranding" and price gouging conviction (the Massachusetts Matter). PSR ¶ 61. Misdemeanor misbranding is a strict liability crime for which no *mens rea* is required. At the onset of the pandemic, Mr. Motha, like hundreds of other people, independently sourced masks and other personal protective equipment (PPE) that would be later resold on to third-parties. Mr. Motha re-sold masks from a startup company called Advoque (based in California) and the masks were not properly certified by the FDA. No one was alleged to have been hurt by the misbranding. For that conviction, he was sentenced to one year of probation, a $9,500 fine, and a $50 special assessment. *Id.* No restitution was ordered, because the customers who had purchased the masks had been refunded in full. He paid the assessment the day of sentencing and the fine in June 2025. PSR ¶ 60. He served the year of probation in this District. His probation was successfully terminated on April 8, 2026. *Id.*

The Massachusetts misdemeanor case has nothing to do with Location Ventures, nothing to do with payroll taxes, and no overlap in victims, co-conspirators, or money with the conduct before this Court. The Massachusetts conduct occurred between March and July of 2020. *Id.* The conduct in this case ran from 2017 into 2023. These are not two crimes committed one after the other by a man who was punished, learned nothing, and went back out and did it again. The Massachusetts case was charged in October 2024 and resolved in April 2025. This case was not charged until March 2026, seventeen months later, by the Southern District of Florida, for conduct that had ended *before* the Massachusetts case was ever brought.

The consequence is measurable with respect to his offense levels. Because the Massachusetts judgment was entered first, Mr. Motha now carries a criminal history point and is ineligible for the two-level reduction under USSG § 4C1.1. Had the Government charged this case at any point before that judgment, he would have come to sentencing with zero criminal history points, and § 4C1.1 would have been on the table. Mr. Motha received the § 4C1.1 reduction in Massachusetts, where his combined offense level was six and thus the reduction made no difference to his sentencing. Plea Agreement ¶ 3(e), *United States v. Motha*, No. 24-CR-10309-MJJ (D. Mass.). Here, where it would matter, the sequence of events has foreclosed it.

Mr. Motha respectfully asks the Court to weigh the § 3553(a) analysis as a whole in this case, understanding the implications and circumstances of his criminal history point and the effect of his successful completion of federal probation.

**F. Probation Will Ensure Restitution is Paid.**

Section 3553(a)(7) directs the Court to consider "the need to provide restitution to any victims of the offense." $449,979.70 is owed to the Location Ventures Receivership, although the employees have already been made whole. PSR ¶ 43. More than $800,000 in penalty and interest is also outstanding. PSR ¶¶ 38, 45. Both obligations are joint and several with Kapoor, who is serving a 136-month sentence and whose own restitution will not be fleshed out until a hearing on November 5, 2026. Judgment, *Kapoor*. As a practical matter, Mr. Motha is the only one of the two who can pay anything to the Receivership in the years ahead, and only if he is working. Mr. Motha owes those amounts with a negative net worth, personal monthly income of $526, and a Probation Office finding that he cannot pay a fine on top of mandatory restitution. PSR ¶¶ 96, 114.

As noted, Mr. Motha is determined to pay his restitution as even prior to the entry of the restitution order, he insisted on pre-paying the government $50,000. Restitution gets paid by

people who are working. A term of imprisonment of any length would take Mr. Motha out of the workforce and take with it the earning capacity any restitution money must come from. It would also have sharp consequences for employment thereafter, and it would cost the public more. The Report puts imprisonment at $54,900 a year and supervision by a probation officer at $6,222 and directs the Court to weigh that difference under USSG § 5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). PSR ¶ 124. Probation, with a court-ordered payment schedule and full financial disclosure to the Probation Office, produces payments rather than taxpayer burden.

**G. Proposed Conditions of Probation.**

Probation is a serious and meaningful sentence. The Probation Office wrote its recommended special conditions in the language of supervised release. PSR ¶¶ 147 to 150. Mr. Motha proposes them, and more, as conditions of probation:

- A term of three years, and Mr. Motha does not oppose a longer term, up to the statutory maximum of five years under 18 U.S.C. § 3561(c)(1);
- Full financial disclosure to the United States Probation Office, including all business and personal finances, which has already been produced (PSR ¶ 148);
- A court-ordered restitution payment schedule, with notice to the probation officer of any material change in his economic circumstances (PSR ¶ 150);
- A bar on serving as an officer, director, or signatory with authority over the payroll or tax accounts of any business, together with disclosure of his interest in JDM Supply, LLC and of any change in it;
- Continued cooperation with the Internal Revenue Service in its civil examination, assessment, and collection, as the Plea Agreement already requires;

- The restriction on associating with Mr. Kapoor that the Probation Office recommended (PSR ¶ 147); and,
- A substantial term of community service.

*Gall* called probation "a substantial restriction of freedom." 552 U.S. at 48. A probationer cannot leave the district without permission. He cannot move or change jobs without telling his officer first. He submits to home visits and to searches of his person and his property. He answers his officer's questions truthfully. And he lives for years knowing that one violation puts him in custody.

**H. If the Court Concludes That Probation Alone Is Not Enough.**

Mr. Motha asks for probation. If the Court is not prepared to impose it, the defense respectfully submits that the next step is not the guideline range but probation with a condition of confinement. Title 18 authorizes home detention "as an alternative to incarceration" as a condition of probation, 18 U.S.C. § 3563(b)(19), and community confinement and home detention are recognized sentencing options under USSG §§ 5F1.1 and 5F1.2. A term of probation with a period of home detention, together with the conditions outlined below, would impose real confinement, preserve Mr. Motha's ability to work and to pay restitution, and keep his family off public assistance.

A non-custodial sentence of either shape is ordinary in these cases. Of the tax offenders who received no prison term in fiscal year 2025, 22.2 percent received probation alone and 7.1 percent received probation with a condition of confinement. 2025 Sourcebook tbl. 13. If the Court concludes that some period of custody is required notwithstanding all of the above, Mr. Motha asks that it be the shortest term the Court believes sufficient, imposed with a recommendation for

designation to a facility within reach of his family in South Florida and for placement in a residential reentry center for the maximum period permitted.[6]

## VII. CONCLUSION

For the foregoing reasons, Mr. Motha respectfully requests that the Court vary downward and impose a sentence of three years' probation on the conditions set forth below, together with restitution as provided in the Plea Agreement and the $100 mandatory special assessment, and that it decline to impose a fine.

Mr. Motha has accepted full responsibility for the conduct here. But he was not the executive who made the decision to withhold the tax; the Probation Office found as much, and Kapoor, the man who did make those decisions received sixteen months on this conspiracy last month. The taxes have since been paid in full, and what is still owed will be paid by a man who is working. Mr. Motha has done a federal sentence for conduct from these same years and did it without a single problem, and he has been in full compliance on pretrial release since April. He is

[6] The defense respectfully requests that the Court decline to impose a fine. The guideline fine range is $10,000 to $95,000. PSR ¶ 123.[6] Section 5E1.2(a) calls for a fine "except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," and 18 U.S.C. § 3572(a) directs the Court to consider the defendant's income, earning capacity, and financial resources.The Probation Office reviewed Mr. Motha's net worth statement, his monthly cash flow statement, three months of statements on two bank accounts, his brokerage and retirement account statements, a civil settlement agreement, his 2025 tax return, an Equifax credit report, and a LexisNexis search. PSR ¶¶ 97 to 111. It found a negative net worth and personal monthly income of $526 against monthly expenses of $8,502, and it concluded that Mr. Motha "does not have the ability to pay a fine in addition to mandatory restitution." PSR ¶¶ 96, 114.A fine would also come out of the same pocket as the restitution, and Congress has already decided that question. Where a defendant owes restitution, the Court "shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(b). Every dollar taken as a fine is a dollar the IRS does not get. Mr. Motha does not oppose the entry of a restitution order in the amounts set out in the Plea Agreement, and he does not oppose the $100 mandatory special assessment. PSR ¶¶ 45, 122.

forty-two, with a wife who is supporting the household, a son, and elderly parents in Massachusetts. The letters at Exhibit 1 describe the man his family and friends know. A sentence of probation lets him go on paying back the IRS and paying restitution to the Receivership. The defense thanks the Court for its consideration.

Respectfully submitted,
*/s/ Brooke C. Watson*
Brooke C. Watson
Fla. Bar No. 1074904

Eric S. Rosen
Dynamis LLP
1 S.E. 3rd Avenue, Suite 1000
Miami, Florida 33131
561.980.5169
bwatson@dynamisllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Brooke C. Watson
Brooke C. Watson